2013 1034 GALDERMA LABS v. TOLMAR INC Mr. Stenberg Thank you, Your Honor. May it please the Court. GALDERMA's own Prior Art Schrute patent disclosed the same drug, the same concentration, but the treatment of the same disease as the asserted claims. That makes these claims obvious. When GALDERMA came out with its first commercial embodiment, the .1% concentration, they listed the Schrute patents in the orange book covering that product. When they came out with their next commercial embodiment, the .3% concentration, they also listed the Schrute patents as covering the .3% concentration. Why? Because the Schrute patents claimed a range that included the .3% concentration. So, GALDERMA has already claimed the .3% concentration in the Schrute patents and has had a patent monopoly on that concentration, the .3% concentration, for 20 years. Well, sure. I mean, I don't think anybody disputes that. But having said that, even if we apply iron grip and even if we construe iron grip to create some sort of presumption, there's still a teaching away issue and there's still an unexpected results issue. And you had an eight-day bench trial here and the judge made fairly detailed findings with regard to teaching away and with regard to unexpected results. So, it seems to me you have to really overcome those and I don't think you would disagree with me. No, you're absolutely right. And I think on both of those, on teaching away and on unexpected results, the courts fundamentally misapply this court's case law as to what constitutes a teaching away and what constitutes unexpected results. And if we can accept the proposition that Schrute here, the range in Schrute, establishes a prima facie case of obviousness, we can turn then directly to teaching away. And what the district court said is, look, there's two reasons why he said that it was a teaching away. The first was that Galderma had published an article, a paper, in 1997 saying that the .1% concentration was optimal. But that's not a teaching away. Saying that a particular embodiment is optimal is no more a teaching away than saying that a particular embodiment is a preferred embodiment or even the best mode of practicing the invention. That doesn't teach away from the lesser or less preferred modes of practicing the invention. So, that was point one. The other ground he alleged for teaching away was that you would have expected there to be an increase in side effects with the higher concentration. But, again, that's not a teaching away. The higher concentration, everyone agreed, was going to be a stronger drug. It was going to be more potent. And that would come with an increase in side effects. That's a trade-off. It's not a teaching away. It's a recognition that there's a cost associated with getting this greater benefit. Where is the line drawn in your view of teaching away? Would the judge have had to conclude that the prior art said it was intolerable, that the side effects were intolerable? Do you have to reach that level of intolerability to satisfy teaching away, or can't it be something less than that? This court's case law makes it very clear that it's not a teaching away unless it would have been intolerable, unless it wouldn't work. That is to say, if the proposed invention was not going to be operable, if it was going to be inoperable, that would be a teaching away. In this case... Well, what about if we're talking about side effects? What does that mean with regard to side effects? Does it have to kill someone? It has to be so intolerable that you couldn't use it as an acne medicine. But listen, if it were a teaching away every time you had an increased side effect, then virtually every higher dosage of a drug, of a patented drug, would be entitled to its own new patent because almost always the higher dosages are going to have a higher level of side effects. That's not a teaching away. It's got to be such that it would be intolerable, and we don't have that here. And moreover, on the facts of this case, there was plenty of headroom between the tolerability level of the 0.1% concentration of adapalene and what the medical community had already shown it was willing to accept. Adapalene 0.1 was less irritating than the lowest dosage of this other retinoid, tretinoin, and that was four times less concentrated than the highest dosage that's being sold. And on the district court's own findings, tretinoin was less irritating than Tizerity. And all of these higher dosages of drugs, while they were irritating, were commercially available products that were being prescribed for those patients that had severe acne. And the record here shows that there was plenty of room, plenty of room for a vastly more irritating adapalene. When you say plenty of room, you really mean up to the level of tretinoin. Is that really? And past that, Tizerity is more irritating than tretinoin and it's being prescribed to the public. What does the record show as to the relative severity of side effects of the prescribed dosages of the second drug? I don't remember what you said it was. Tretinoin. Tretinoin, I know. Tizerity. Tizerity. What the record shows, or the district court found, that Tizerity was the most irritating of the retinoids, more irritating than tretinoin. There's not a quantification of how irritating is irritating here, but Tizerity was more irritating than tretinoin and the adapalene, 0.1%, was less irritating than the lowest dosage of tretinoin. And you can see that, if you look at the chart that we've reprinted in our reply brief, on page 14, this is from, again, a Galderma publication, prior publication. There's an enormous amount of headroom between how irritating adapalene, adapalene was designed to be a less irritating drug. Galderma said that to the public. They said it was, the whole point of adapalene was it's supposed to be a milder drug. And it was. The clinical experience and the commercial experience with adapalene is it's a very mild drug. It had, there were, it wasn't as effective, the lower concentrations as the other drugs, but it was a very mild drug. With respect to unexpected results, for more than 140 years, the law has required that the results to be unexpected, to qualify, have to be a difference in kind, not just in degree. That goes back at least as far as… And the judge here concluded that it was a difference in kind and not degree. He applied the right law. Now, you may say that he applied it incorrectly in the facts, right, but he applied the right law. I concur with that. The judge said that what we're looking at is a difference in kind, but I submit to you that all you're looking at here is a difference in the amount, the level, the degree of side effects. The classic cases from the 60s had to do with riboflavin. You change out a couple of methyl groups for an ethyl group, and you end up with a drug that's actually a compound that's actually a riboflavin inhibitor. So, it produced riboflavin deficiencies in laboratory animals that's used for nutritional studies. So, instead of a vitamin, you had an antivitamin. And instead of having a compound that was beneficial to the well-being of an animal, this was detrimental. That is a difference in kind, a difference in biological activity. We don't have that here. There's nothing critical about the 0.3% concentration. But the difference in degree can be dramatic enough, I suppose, to become a difference in kind, can it not? In other words, if you have the prior art range, let's suppose here. Well, let's take what the prior art range is. 0.01 to 1%, I guess, is the preferred range in shrew. So, if we were to discover that at 0.4% there were a strong peak of efficacy and flat irritancy, then that might be enough to constitute a difference in kind. Well, I understand the facts of this case. This is purely hypothetical. So, at starting point, difference in degree can be difference in kind, correct? And I would say no, Your Honor. No. In this court's precedence, in some of the alloy cases, I'm honestly not remembering the name of it. But there's a case involving a wind turbine, a turbine blade. There was a particular alloy that was claimed for it. And this claimed alloy was a 43% increase in strength. And the court said that's not a difference in kind. That's just a difference in degree. The pharmaceutical cases have said you don't have a difference in kind unless you've got a different kind of biological activity. If, under your hypothetical, Your Honor, you had suddenly had efficacy against ethane where you didn't have it before, that would be a difference in degree. You're asking us to discard the statutory requirement of obviousness for something else. I'm not understanding your question. I'm trying to understand this emphasis on the difference in kind. The question is whether the difference would have been obvious to a person of ordinary skill in the field of the invention. And we have a lot of fact-dependent arguments in thousands of cases. You're telling us that that doesn't count anymore? Surely not. What the cases stand for, the proposition, is that in order to make this a patentable difference, you have to have a difference in kind. The Supreme Court said it in 1874, and this court has said that many times. What we have here, while I agree with Judge Prost that the district court below said there was a difference in kind here, all that you have is a difference in the expected level of side effects. That is the classic difference in degree that's not sufficient to impart patentability. And I would also suggest that on the factual record here, the district court made error that these were unexpected results. By the priority date, Galderma had already published almost all of its clinical work that it had done with adapalene before it started testing on the 0.3% concentration on acne patients. So they didn't have anything confidential before they started their testing that would have given them any special insight that wasn't available to the skilled person. And based on that published data, before they began testing the 0.3% on humans for acne patients, Galderma told the FDA that they expected that the 0.3% concentration would be only slightly more irritating than the 0.1% concentration. That's what Galderma expected, that's what the skilled artisan would have expected, and that's exactly what Galderma found in their test. Now, the district court said those weren't predictive statements, and I submit to you that that doesn't stand scrutiny. When a manufacturer tells the FDA that a drug it's proposing to test on humans is likely to have a certain level of side effects, that has meaning, and that is predictive. It's not a guarantee, of course, but it's enough to establish a reasonable expectation under this court's case law. What do you say about the court's treatment of the prior art clinical results with respect to, A, healthy patients, B, non-facial treatment, and C, other conditions such as aging skin? Each of which I think used 0.3% if I'm not mistaken. They did use 0.3% on all of those, and Galderma used those very tests as a basis to make its predictive statements to the FDA. The district court simply said, whatever they're saying to the FDA is not a prediction, and I just don't think that bears scrutiny. The court's analysis was based on the court saying, well, this isn't facial skin, it's not young skin, and it's not skin that's subject to the disease of acne. I agree with all of that. All of that is true, and it diminishes in some degree the strength of the prediction, that is to say, but it doesn't make it zero. And, as I say again, Galderma themselves relied on that same exact testing when they were telling the FDA that this new higher concentration was likely to be only slightly more irritating. And they said that before they did any clinical testing of the 0.3% concentration on acne patients. Okay. Thank you, Mr. Sandler. We will save you a little time. Thank you, Your Honor. May it please the court, there are two fundamental problems with Tomar's analysis. The first is that it improperly ignores most of the scope and content of the prior art, seeking to focus its analysis principally on this 1985 vintage original publication at the very incipiency of the work relating to the family of molecules to which adapalene belonged. And secondly, the last point you just heard, is they improperly try to use the inventor's own thought processes and the unpublished work of his co-workers engaged in joint research as evidence of obviousness, which is forbidden by 35 U.S.C. 103A and 35 U.S.C. 103C, and by this court's decisions in LTIB Clonetech. Also followed in the Otsuka v. Sandoz case we cited in our brief. Also followed in the Willey v. Tether case. So before we get too much into that, may I ask, what is your view of the iron grip line of cases which state, and you can disagree with my reading, that if there's a prior art teaches a range and the claimed invention is within that range, then there's a presumption of obviousness. Do you, one, disagree with that reading, and two, do you think that's good law? I think that may be the case, Your Honor, but I think it may also not be the case where the circumstances as it is here, where there's a very substantial body of additional experience about the technology. Here's 17 years' worth of experience, which in the aggregate indicates that there was, in fact, no motivation to do that, that people would have been discouraged from doing it for fear of significant increases in tolerability issues, and where the ability to do it without increasing those tolerability issues was, in fact, unexpected, and that's exactly what we have here. Iron grip allowed for coming back in with teaching away an unexpected result. Iron grip allows for that, right? The problem is that even, for example, their case of trans-ocean, which purports to do a prime of facial obviousness analysis, which is what Your Honor is talking about, says that that has to be done based on the first three Graham criteria, including the scope and content of the prior art. And here there was a bad… Well, that is not a range case. Trans-ocean is not a range case. But the standard is the same. At prime of facial obviousness, if you're going to conclude that based on the scope and content of the prior art, something is on its face obvious without rebuttal, you've got to consider it all. Let's leave aside the whole prime of facial case thing and recycle it. Let's just look at iron grip. Is it your view that if there's a range disclosed in the prior art, that that's irrelevant to the analytical framework when it applies to obviousness? It is not irrelevant. It does not establish a conclusive presumption that… What about an inconclusive presumption? The problem with doing that, it was discussed by this court's opinion in Enright Piasecki, which is cited in Psychobenzaprine, but not in our brief. And the problem is that when you allow your analysis to start with a presumptive finding of obviousness without looking at all of the evidence, as soon as there's more evidence, the law in Piasecki says you have to retrace the path to decision from the beginning. And that's the last step of any proper obviousness analysis under all of this court's precedent. But don't you think iron grip allows for that? Iron grip talks about the presumption and then it talks about teaching away an unexpected result. But there can be more there, Your Honor. There can be… If the teachings of the prior art in their totality have to be considered anew based on the totality of the trial evidence, there is no error in proceeding directly to that analysis. The danger of using a presumption of the sort Your Honor is implying is mentioned in Piasecki. And what it does is it creates the problem of setting that presumption in concrete and measuring the rest of the evidence only for its knockdown value. It takes on a life of its own that has greater significance than the evidence that justified it. The test, the lawful test under 35 U.S.C. 103 at the end of a trial like this is did the defendant prove by clear and convincing evidence based on the totality of the evidence presented that the subject matter would have been obvious. Okay, well let's look at the evidence. Okay, so the district court had some detailed findings with regard to teaching away. But among those findings and seemingly in my view a prominent part of his analysis was talking about whether or not something was optimal. I think he uses that word quite frequently. Is it your view that that's the appropriate test for teaching away? It was here because it's clear what they meant by optimal. The ALEC 1997 article said that that dose had been selected as optimal for both safety and efficacy, that that determination had been confirmed in the clinic. And the Verschuur 1997 article some 10 page later pointed out that a .3% dose was among the materials that was used in clinical testing on the backs of normal patients and that that dose had been rejected for acne. And in those circumstances, the totality of the prior art is saying don't go there. Why? Because by 1998, not back in 1985, by 1998, and this is clear from the Leiden 1998 article, the issues surrounding retinoid research were all about minimizing side effects. And that was born of experience. The doses that were originally introduced were so irritating, kids wouldn't use them. If you put it on your face, these are tender damaged skin of children and young adults, if you put it on your face and it turns red and it burns and it stings and your skin plates off, they stop using it and it doesn't work. But doesn't Schrute itself talk about in the specification that the preferably, compositions and concentrations, preferably between .01 and 1 weight percent? That dose is not tied to adapalene and it is not tied to acne. That is a general statement that says the compositions of this invention, and there are many, many of them, can be used for cosmetic purposes, and there are many, many of them, at a dose between, in this hundred fold range. And all that tells you is that a dose for all of those molecules can be found for those conditions somewhere within that range. There is nothing that ties that range to acne. And in fact, to the extent topical formulations are described in Schrute with adapalene, they are all .1 percent and lower. What's your view on what the level is? What's the characterization? I mean, clearly, I think everyone agrees, if it's intolerable irritability, that's sufficient. What is your characterization of what would be sufficient or insufficient? If the fear was that the tolerability issues would increase to the point where it would diminish patient compliance, then the art of the day would have discouraged going in that direction. That's what Lyman is all about. That's what the testimony was all about. It wasn't those small changes. You said the standard is if it would have diminished patient compliance. If it would have been... All obviousness cases deal with misperception. We now know that this drug, we triple the concentration, we get better efficacy... Right, and so there's often a way, right? Increased efficacy often leads to some enhancement of the irritability. And it's a question of how much is enough, right? But the problem here was what everybody was trying to do was minimize irritancy, not increase irritancy. All of the other retinoids... But they were also at the same time trying to increase efficacy. Are you saying any diminishment of side effects, any enhancement of side effects, no matter how minimal, would have been... There was evidence, was there not, that the dermatologists at the Dermatologists' Convention were complaining about .1%. It's just not strong enough, right? And importantly there, not one person in that group, and in fact nobody in the 10 years between 1991 and 2002, ever suggested increasing the dose of adapalene. And quite to the contrary, Dr. Lydon, who was at that Bruchard Conference, when he had published a year earlier in 1998, a discussion about ideas for adapalene treatment, suggested one that would allow reduced drug dosage. And that's at page 20102. Well, I think I jumped on Judge Proch's question you were about to answer, so pardon me. I thought we were done. Were you not? Okay. If you had more in response to Judge Proch, I'm sorry if I interrupted you. I mean, this is one of those cases where it's important to let the evidence tell us what the answer is, and not to have some hunch of what we think it might be, which is really the problem that Cyclopenzaprine was trying to address. And the solution is, retrace the path of the obviousness judgment by considering the totality of the trial evidence. And when you do that here, the evidence showed that people of ordinary skill in the art would have been concerned about significant increases in tolerability issues if you tripled this dose. Keep in mind this is not a small increase. What evidence, other than the evidence of some increase in irritability between 0.03 and 0.1, what evidence was there that 0.3 produced a substantial increase in irritability? The evidence was that the tolerability measures were already hitting south. That was what I was trying to take off the scale, of the indications, the kind of extrapolation of the curve. Setting aside that evidence, was there any evidence that somebody actually did tests at 0.3 and sure enough, it was terribly injurious to the patients? The evidence, first off, I think you cannot ignore the fact that... I understand. That's your principal point. I'm trying to see if there's anything more than that point, such as a test of 0.3. There was experience, of course, with the other retinoids, which when you doubled those doses, you got significant increases in tolerability problems that actually impeded the treatment efficacy. And the expectation was that a dapolene was a retinoid and that same pattern would prevail. And more importantly, we're dealing here with the perceptions of a person's skill in the art. He's told that a study has been done in the clinic and a determination has been made that 0.1 is where you can go for efficacy and safety. That 0.3 has been considered and it's been rejected. That it's used only in conditions, much older people with decades of sun exposure, where the literature is rife with teachings that those people are not nearly as sensitive to this retinoid irritation. That's the only place it's used. And you've got the focus, again, from life. Everybody was trying to minimize side effects, not increase them. There were plenty of retinoids that could have the retinoid effect, but that were so irritating that they inhibited use by this sensitive population. Now, and just to address the point, the back testing, the testing that is reported was on the back of healthy volunteers. And Dr. Maybach's publication and Dr. Lyden's publication both indicate that fails to predict the activity on acne-damaged skin and the more sensitive skin on the face. And so those statements would not really suggest to anybody that it was safe for use in acne. And, in fact, the fact that it was rejected by Galderma, that it had been looked at and rejected, would have led them to believe that there was nothing fruitful to be done by going there. To the extent that disclosure of a range might make obvious the selection of an optimal value within the range, which is what a lot of these cases say, like Peterson, for example, that ground had already been plowed and that determination had been made that it was 0.1 and that there was nothing more fruitful to be obtained by looking at anything else. There was no motivation to begin with by the time we get to 2002, which is the time the obviousness analysis must be done to do what these applicants have done. Back to the back testing. When you look at those data, the 0.03 and 0.1 patch testing was labeled as non-irritant. There was no difference between those two. The 0.3 was labeled as slightly irritant. And we already know from Verschuur 1991 that even though no difference was detected between 0.03 and 0.1 in the back patch testing, there was a meaningful increase in those tolerability measurements reported in that article. And so when you then have a material which is an unsensitive test, you have 0.3 in a very unsensitive test, that is already more irritating than the ones you tested and had problems with, that itself also, it seems to me, would deter people from going forward. The fact of the matter is the testimony on the record was that people of ordinary skill in the art would have expected significant diminution in tolerability measures and that would have dissuaded people from going in this direction, that the result that the tolerability measures were in fact comparable was in fact and would have been unexpected by people of ordinary skill in the art. And that the evidence as a whole, which is after all what we have to consider under Section 103, led to the conclusion based on detailed factual findings that the subject matter would not have been obvious at the time. Thank you. Thank you, Mr. Ripson. Mr. Steiner. Just briefly, Your Honor. Schrute discloses a range, that range, and it claims the range. It says that the adaptin molecule is less irritating than other retinoids and that it's claimed that range, and by claiming that range they've claimed the 0.3% concentration for 20 years. Now the district court says we're entitled to, the government's entitled to another 20 years of patent protection on that same 0.3% concentration. And I submit to you that that is a mistake that ought to be corrected. All of the testing that's out there to respond to Judge Bryson's question showed that the 0.3% which was tested not just on healthy patients but also on patients with photo-damaged skin, all of that showed the 0.3% was well tolerated. And that testing on healthy patients and on patients with photo-damaged skin was what Galderma, not the inventors, Galderma used as a basis for telling the FDA that they expected that the 0.3% concentration would be only slightly more irritating than the 0.1% concentration which it was. Well what about the point that I think, I think I got Mr. Lipsy right on this and if I didn't then you'll recall his statement, that you're really relying on the inventors' conception as evidence of prior. None of the statements that we're talking about were made by the inventors. They were made by people working at Galderma. The statement that's in the protocol that says that we expect it to be only slightly more irritating, that's in the protocol written by a Stefan Macero. So you're distinguishing between something that the company does and something that the company's inventors come up with. Correct, correct. And do you have any case law that would draw our attention to that distinction? I frankly don't know what the rule is and I'm looking for guidance. I don't have it at my fingertips. The Life Technologies case and the statute that Mr. Lipsy was citing talks about the inventors, how the inventors came to the invention. We're not talking about statements made by the inventors. And the important point is this. At the point that these statements are being made, these predictions are being made about what they expect, the Galderma employees stood in exactly the same shoes as the hypothetical skilled person because Galderma had published all of this art. The issue is what would the skilled person have thought to be obvious. And I'm just saying that the statements by Galderma's employees corroborate what the skilled person did. Thank you. Thank you, Mr. Steinberg. Thank you, Mr. Lipsy. The case is taken under submission.